THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT BRADLEY MELENDEZ,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS**<br><br>Case No. 4:21-cr-00089-DN-JCB<br><br>District Judge David Nuffer<br>Magistrate Judge Jared Bennett |

Defendant Robert Bradley Melendez moved to suppress all evidence obtained from a warrantless search of his person and his vehicle on August 10, 2021 ("Motion to Suppress").[1] An evidentiary hearing was held on December 20, 2021,[2] at the conclusion of which findings of fact were orally stated on the record.

Because the deployment of a K-9 to sniff the exterior of Mr. Melendez's vehicle extended Mr. Melendez's detention beyond the original basis for the stop, and because the officer lacked a reasonable articulable suspicion of criminal activity to extend the stop, Mr. Melendez's Motion to Suppress[3] is GRANTED.

---

[1] Docket no. 22, filed Sept. 16, 2021.

[2] Minute Entry for Proceedings Held Before Judge David Nuffer, docket no. 39, filed Dec. 20, 2021.

[3] Docket no. 22, filed Sept. 16, 2021.

## Contents

FINDINGS OF FACT...................................................................................................... 2
CONCLUSIONS OF LAW ........................................................................................... 21
　　The Initial Investigative Detention was Lawful................................................. 21
　　The Stop Was Extended Beyond Its Initial Scope ........................................... 22
　　The Extension of the Stop Was Unlawful......................................................... 25
　　　　The time of night and location of Mr. Melendez's vehicle.................................. 26
　　　　Deputy Warren's perception of Mr. Melendez being nervous ............................ 27
　　　　Mr. Melendez's Travel Plans .................................................................... 31
　　　　The amount of cash Mr. Melendez was traveling with........................................ 33
　　　　The totality of circumstances ................................................................... 34
　　Conclusion ............................................................................................... 35
ORDER........................................................................................................... 36

## FINDINGS OF FACT[4]

Richard Warren is a Deputy Sheriff in Millard County, Utah.[5] He has 16 ½ years law enforcement experience, including eight years at the Utah State Prison; four years with Millard County working in the jail; and four and a half years with Millard County as a patrol deputy.[6] Prior to beginning his patrol responsibilities, Deputy Warren completed training with POST and was certified as a Utah Peace Officer.[7] He has completed basic narcotics training, including the identification and field testing of drugs.[8] He has also been trained and certified as a K-9 officer, and works with a K-9 that has been certified in tracking, detention, and drug detection through the Utah POST Program.[9]

---

[4] Determining the facts in this case was difficult. The evidence consists primarily of testimony from the officer, given several months after the encounter; that officer's report, written the morning after the encounter; and a video of portions of the encounter, taken from the patrol car's dash camera the night of the encounter. In multiple instances, these three sources offer different versions of the events. At times, the officer's testimony coincides with his written report. But his testimony and report also differ at other times. And his testimony and report often vary from what is shown in the video.

[5] Motion to Suppress Hearing Transcript ("Transcript") at 13:6-14, docket no. 36, filed Jan. 4, 2022.

[6] *Id*. at 13:16-20.

[7] *Id*. at 13: 21-14:5.

[8] *Id*. at 14:6-13.

[9] *Id*. at 14:19-15:2.

One week prior to the encounter involving Mr. Melendez, Deputy Warren attended training in the Desert Snow program in Salt Lake City, which consisted of 40 hours of specific training on drug interdiction, including what questions to ask; locating drugs in a vehicle, including hidden compartments; the nature of the drug business; and how to interpret certain interactions with people, such as their mannerisms, speech, and things that they say or do not say.[10] Deputy Warren has also had on-the-job experience with previous drug seizures and arrests, some of which involved methamphetamine interdiction and visual identification and testing.[11]

Deputy Warren reviewed his police report ("Police Report" or "Report")[12] in preparation for the evidentiary hearing on Mr. Melendez's Motion to Suppress, and also reviewed his anticipated testimony with the government's counsel.[13] However, due to technical reasons, he was unable to review the video recording of the encounter prior to testifying.[14] Deputy Warren testified that his recollection of events was better when he wrote his Report on August 11, 2021, than the day he testified, December 20, 2021.[15] Deputy Warren also stated that in the event of any discrepancies between his Report and the video recording of the encounter ("Video"),[16] the Video would be the more accurate representation of events.[17]

On August 10, 2021, Deputy Warren was working as a patrol deputy in the areas of the City of Fillmore and in Millard County, Utah generally.[18] His duties included looking for traffic

---

[10] *Id*. at 16:2-23.

[11] *Id*. at 17:14-18:3.

[12] Suppression Hearing Exhibit G ("Police Report").

[13] Transcript at 41:6-24.

[14] *Id*.

[15] *Id*. at 43:14-19.

[16] Suppression Hearing Exhibit F ("Video").

[17] Transcript at 43:20-24.

[18] *Id*. at 18:4-9.

violations and responding to any calls needing law enforcement.[19] At about 11:00 p.m., Deputy Warren was conducting patrol near the I-15 freeway Exit 163, known as the South Fillmore Exit.[20] Deputy Warren's Report indicates that his attention was called to a vehicle at 11:14 p.m., but that time is erroneous—the initial encounter with the vehicle and its occupant was a few minutes before 11:00 p.m.[21]

Deputy Warren noticed a black vehicle parked outside Slaven's Motel, a private property under renovation and not in operation, on the east side of the freeway at the edge of Fillmore City.[22] There were no signs indicating the motel's closure and no signs warning against trespassing.[23] The motel shares, and can be accessed through, the parking lot of the gas station next-door.[24] There were no other cars or lights in the immediate area of the black vehicle.[25] There was lighting at the freeway exit, some 70 yards distant, and at the gas station, but none in the immediate area of the motel.[26] There is also an abandoned storage unit facility, with a few storage units, in the immediate area.[27] The motel had drawn the attention of law enforcement in the area due to recent incidences of vandalism (graffiti) and property damage (broken windows) attributable to young adults in a minivan and kids with skateboards.[28]

---

[19] *Id*. at 18:10-18.

[20] *Id*. at 19:2-8.

[21] *Id*. at 109:1-17.

[22] *Id*. at 19:7-14.

[23] *Id*. at 46:18-25.

[24] Suppression Hearing Exhibit A; Suppression Hearing Exhibit C.

[25] Transcript at 20:12-16.

[26] *Id*. at 20:14-16, 54:12-24.

[27] *Id*. at 20:9-11.

[28] *Id*. at 20:17-24, 47:13-48:2, 48:24-49:5; Police Report at 3.

Deputy Warren's dash camera automatically activates whenever he turns on his red and blue lights.[29] Because Deputy Warren did not turn on his red and blue lights when approaching the vehicle, the camera did not automatically start recording the encounter.[30] The Video began recording several minutes after the encounter was initiated, when Deputy Warren manually activated it by pressing a button on his person.[31] The recording goes back as much as two minutes before the camera is activated.[32] Millard County Sheriff's Department Policy requires officers to manually activate their cameras if they do not turn on their red and blue lights, but Deputy Warren did not do so when initiating the encounter.[33]

The vehicle, a black Infiniti SUV, was located at the east side of the motel near some graffiti.[34] Being aware of the recent incidents at the motel, Deputy Warren engaged in an investigatory encounter to determine why the vehicle was parked at the motel.[35] After first observing the vehicle, Deputy Warren drove through the gas station parking lot, past semi-trucks that were parked in the parking lot, to where he could see the east side of the motel and the vehicle by the motel's door.[36] Deputy Warren pulled his patrol vehicle around to position it so that he had a clear view of the vehicle with his headlights shining directly on the vehicle.[37] In so doing, Deputy Warren testified that he saw a male subject later identified as Robert Bradley

---

[29] Transcript at 29:1-20.

[30] *Id*. at 29:1-11.

[31] *Id*. at 29:1-11.

[32] *Id*. at 114:13-15.

[33] *Id*. at 58:16-59:21.

[34] *Id*. at 20:11-25, 22:1-3.

[35] *Id*. at 63:7-10; Police Report at 3.

[36] Transcript at 21:18-23.

[37] *Id*. at 22:8-9.

Melendez, urinating on the side of the motel.[38] Deputy Warren believed that Mr. Melendez had

committed public urination and noted such in his Report.[39] However, Deputy Warren clarified in

his testimony that he did not actually see Mr. Melendez urinating, but rather, only zipping up his

pants.[40]

Mr. Melendez was in a position where no one was able to see him urinating on the side of

the building.[41] The freeway off-ramp is many yards distant;[42] the area was unlit;[43] and the area

was not visible from the gas station.[44] It was dark enough that Deputy Warren felt it necessary to

activate his flare camera that finds thermal images.[45]

Realizing that someone approached and that he was no longer alone, Mr. Melendez

"hurried and did up his pants" and "walked towards [Deputy Warren's] patrol vehicle."[46] Deputy

Warren told him to stop where he was and, for the safety of himself and Mr. Melendez, directed

him to sit in the driver's side of the black Infiniti.[47] Mr. Melendez did as Deputy Warren

instructed, making no attempt to leave or resist.[48]

Deputy Warren advised Mr. Melendez that there was a restroom at the gas station and

that he "was not suppose[d] to be urinating out in the open."[49] Mr. Melendez indicated that he

---

[38] *Id*. at 22:8-15; Police Report at 3.

[39] Transcript at 22:15-20.

[40] *Id*. at 56:7-9.

[41] *Id*. at 56:10-16.

[42] *Id*. at 54:19-24.

[43] *Id*. at 54:25-55:3.

[44] *Id*. at 53-57, 123:9-12.

[45] *Id*. at 60:23-61:6.

[46] *Id*. at 22:24-23:2; Police Report at 3.

[47] Transcript at 23:1-14.

[48] *Id*. 23:18-20.

[49] *Id*. at 63:25-64:3; Police Report at 3.

was just looking for a place to camp, and Deputy Warren told him he could not camp there, and that he should go by the semi-trucks in the parking lot because there were bathrooms at the gas station.[50] Mr. Melendez explained that in his experience, the truck stop was not a realistic option because he gets kicked out of the trucker areas.[51] Deputy Warren responded stating, "we [(meaning Millard County police officers)] don't do that."[52]

By the time Mr. Melendez got back into the black Infiniti, Deputy Warren had already ascertained the type of vehicle—SUV Infiniti, a make he knew to be a higher end and a higher priced vehicle[53]—and the approximate age of Mr. Melendez[54]—not the typical demographic to engage in the vandalism recently experienced by the motel, *i.e.*, "younger adults"[55] or "kids [with] skateboards."[56] Deputy Warren was quickly able to determine that Mr. Melendez was not involved in vandalism, trespassing, or criminal mischief.[57]

Once Mr. Melendez was back inside the vehicle, Deputy Warren asked no further questions pertaining to public urination.[58] And Deputy Warren never began writing a citation for public urination before arresting Mr. Melendez.[59] Instead, Deputy Warren, having completed a

---

[50] Transcript at 23:23-25.

[51] *Id*. at 65:1-5, 78:1-25.

[52] *Id*. at 65:1-8. There are uncertainties between Deputy Warren's Police Report and his testimony regarding when the conversation about the restroom, urinating in public, and a place to camp occurred. The Report does not mention Mr. Melendez getting back into the black Infiniti, which suggest that this conversation would have occurred outside the vehicle and within the first few moments of the encounter. Police Report at 3. Deputy Warren's testimony indicates that he had Mr. Melendez get back inside his vehicle. Transcript at 63:25-64:25. Additionally, while the Video depicts an exchange occurring between Deputy Warren and Mr. Melendez while he was inside the vehicle, that portion of the Video has no sound. Video at 00:00:01-00:00:20.

[53] Transcript at 48:15-17.

[54] *Id*. at 49:10-11.

[55] *Id*. at 48:25-49.

[56] *Id*. 47:24-48:2; Video at 00:02:17-00:02:25.

[57] Transcript at 49:12-19, 84:20-23.

[58] *Id*. at 85:9-23.

[59] *Id*. at 57:11-23, 85:9-23.

comprehensive drug interdiction program only the week prior,[60] proceeded by "asking [Mr. Melendez] questions from [his] interdiction training."[61]

Deputy Warren asked "where [Mr. Melendez] was coming from?"[62] Mr. Melendez replied that he traveled 15 ½ hours straight.[63] Deputy Warren again asked, "Where did you travel from," to which Mr. Melendez answered "Merced, California."[64] Deputy Warren had traveled to parts of California, and believed such travel to take between 10 and 11 hours.[65] However, Deputy Warren did not testify that he knew where Merced was located in California, or that he had ever travelled to Merced.[66] Deputy Warren was also told that Mr. Melendez had made at least one stop along the way to get gas.[67] Deputy Warren next asked where Mr. Melendez was traveling.[68] Mr. Melendez told Deputy Warren that he was going to Minnesota.[69]

Deputy Warren testified to perceived pauses, slight hesitations, and glancing away when Mr. Melendez answered these questions.[70] Deputy Warren found the pauses to be significant because, in his experience, most people know where they are going and can answer that question

---

[60] *Id*. at 15:23-16:4.

[61] *Id*. at 23:20-24:6, 31:6-8, 65:4-66:8.

[62] *Id*. at 24:5-9, 65:11-18, 66:2-5; Police Report at 3.

[63] Transcript at 24:6-7.

[64] *Id*. at 25:2-6.

[65] *Id*. at 25:10-12.

[66] Video at 45:44.

[67] Transcript at 83:21-84:1.

[68] *Id*. at 26:1-4.

[69] *Id*. at 24:9-13, 65:11-18, 66:2-5; Police Report at 3.

[70] Transcript, 24:10-13, 31:6-10, 26:4-8; Police Report at 3.

pretty quickly.[71] Deputy Warren formed the impression that Mr. Melendez's answers were evasive or not entirely true.[72]

Deputy Warren looked into Mr. Melendez's vehicle and saw that there were no other occupants; that the back seat was folded down; and that the only contents were a suitcase and gray tote in the back cargo area.[73] Deputy Warren asked for Mr. Melendez's identification and was given a California identification card identifying the driver as Robert Melendez.[74] He then requested a driver's license and identity check from dispatch, as well as a check for wants and warrants.[75]

Deputy Warren then continued with his interdiction questioning. The specific questions asked differ as recorded on the Police Report from Deputy Warren's testimony. And these questions cannot be heard in the Video. According to the Police Report, Deputy Warren asked if there was "anything illegal" in the vehicle, to which Mr. Melendez responded that there was not.[76] Deputy Warren testified that he asked specific, individual questions regarding whether there was marijuana, heroin, cocaine, or methamphetamine inside the vehicle.[77] Deputy Warren also testified that Mr. Melendez quickly said no to all questions except the methamphetamine question, at which he paused before saying no.[78] And in a later conversation with another officer,

---

[71] Transcript at 26:9-18.

[72] *Id*. 25:7-25.

[73] *Id*. at 26:19-25.

[74] *Id*. at 27:17-23.

[75] *Id*. at 30:13-25.

[76] Police Report at 3.

[77] Transcript at 31:10-16.

[78] *Id*. at 31:9-22.

Deputy Warren stated that Mr. Melendez paused before responding to the heroin and methamphetamine questions.[79]

Deputy Warren next asked whether Mr. Melendez had any large amounts of cash, to which Mr. Melendez answered no.[80] Deputy Warren testified to perceived hesitation and glances away prior to Mr. Melendez's response.[81] However, in retelling the events to another officer later that night Deputy Warren did not inform the other officer that Mr. Melendez paused before answering this question.[82] Deputy Warren also testified that he perceived Mr. Melendez's hands shaking at this time.[83] The perceived hesitation, glancing away, and shaking indicated nervousness to Deputy Warren.[84] Deputy Warren also perceived that the defendant was getting agitated in response to his pointed questions.[85]

This entire line of questioning was not captured on Video. Thus, any observation regarding the alleged pauses, hesitations, shaking, or nervousness displayed by Mr. Melendez are not corroborated.[86] But later the Video depicts a calm and responsive Mr. Melendez,[87] with Mr. Melendez never observed as being confrontive, angry, or raising his voice,[88] and displaying no

---

[79] Video at 46:41.

[80] Transcript at 31:18-22.

[81] Id. at 31:10-22 (answer and perceived behavior to specific questions about drugs), 31:18-22 (answer and perceived behavior to question about large amounts of cash); Police Report at 3 (reporting answers and perceived behavior regarding the drug specific questions, but not mentioning question regarding large amount of cash or perceived behaviors in response the question).

[82] Video at 33:26.

[83] Transcript at 32:1-4, 38:16, 76:13-22.

[84] Id. at 31:23-32:5, 38:16-18.

[85] Id. at 32:9-24.

[86] Id. at 130:12-13.

[87] Id. at 86:9-87; Video at 00:04:13-00:04:28.

[88] Transcript at 130:1-13; Video.

visible agitation or nervousness.[89] To the contrary, the Video shows Mr. Melendez being calm and cooperative, though possibly confused at what was happening. Deputy Warren also testified that Mr. Melendez's level of nervousness stayed the same throughout the encounter, and did not change between times not shown on the Video and times that are shown on the Video.[90]

Throughout the encounter, Deputy Warren did not smell any drugs, nor did he believe Mr. Melendez to be inebriated in any way.[91] Also throughout the encounter, Mr. Melendez's actions did not cause Deputy Warren to believe that he was armed or dangerous.[92] Nevertheless, Deputy Warren said the dark and remote nature of the location necessitated caution for the safety of Deputy Warren and Mr. Melendez.[93]

As Deputy Warren was interacting with Mr. Melendez, he noticed that the video on his dash camera was not operating and he pressed the button to manually start the Video.[94] The sound on the Video did not start for another 30 seconds.[95] At this point, Deputy Warren had Mr. Melendez exit the vehicle and stand in front of the patrol car.[96] Deputy Warren then had Mr. Melendez empty his pockets on the front of the patrol car and lift up his shirt, exposing his bare

---

[89] Transcript at 130:1-13; Video.

[90] Transcript at 111:7-18.

[91] *Id*. at 91:5-15.

[92] *Id*. at 82:3-8, 82:17-20.

[93] *Id*. at 23:1-14.

[94] *Id*. at 28:9-11.

[95] *Id*. at 74:10-13; Video.

[96] Transcript at 32:12-15, 33:4-6, 70:21-23.

flesh.[97] Deputy Warren performed a pat-down search of Mr. Melendez.[98] The Video depicts that Mr. Melendez appeared annoyed, but not nervous.[99]

In emptying his pockets at Deputy Warren's instruction, Mr. Melendez pulled out several items, including money with a rubber band around it and a cell phone.[100] In response to the seeing the money, Deputy Warren asked, "how much money is going to be inside that," to which Mr. Melendez replied "a little over $2,000."[101] Mr. Melendez explained that this money was his traveling cash.[102] Deputy Warren testified that the money "kind of throws up a flag for me. It's all in twenties, tens and ones."[103] Deputy Warren testified that based on his training and experience, the fact that Mr. Melendez earlier said he did not have a large amount of money and the manner in which the cash was bundled with rubber bands, he formed an opinion that this was a possible indicator of distribution and sales of narcotics.[104] However, Deputy Warren testified that the money "could [have] be[en Mr. Melendez's] travel money."[105] And at this point, the rubber bands around the money were visible, but the denominations could not be seen when the money was placed on the hood of the patrol car.[106]

---

[97] Video at 00:00:29-00:01:29; Transcript at 32:12-15 (empty pockets), 33:4-6 (empty pockets), 71:6-15 (empty pockets), 76:7-9 (lift shirt), 76:11-15 (*Terry* frisk); Police Report at 3 (empty pockets; does not mention lifting up shirt).

[98] Transcript at 32:13-15, 76:7-15.

[99] *Id*. at 75:14-16.

[100] *Id*. at 33:19-22 (money); Police Report at 3-4 (cell phone).

[101] Video at 00:00:45-00:01:02; Transcript at 75:21-76:5.

[102] Video at 00:00:45-00:01:02; Police Report at 3; Transcript at 33:19-24, 75:21-76:5.

[103] Transcript at 33:25-34:1.

[104] *Id*. at 34:6-15.

[105] *Id*. at 33:25-34:1.

[106] *Id*. at 126:25-127:2; Video at 00:00:29-00:01:05.

After emptying his pockets, lifting his shirt, and being searched, Mr. Melendez asked Deputy Warren, "What's the purpose of like this whole routine?"[107] Deputy Warren responded stating, "Just asking questions."[108] Deputy Warren informed Mr. Melendez that he was going to run K-9 Bonsai ("K-9") around the vehicle.[109] Deputy Warren gave Mr. Melendez two options: (1) give his consent to run the K-9; or (2) run the K-9 without consent, stating "It's up to you."[110] Mr. Melendez denied consent replying, "I'd rather just leave."[111] Deputy Warren responded saying, "You're not going to leave, you're detained right now, okay. I'm investigating why you're back here."[112]

After being told he was detained, Mr. Melendez inquired about the purpose of his detention, asking if he was "being suspected of a crime," to which Deputy Warren responded, "No."[113] In his testimony, Deputy Warren characterized Mr. Melendez as getting "angry," "argumentative," "worked up," and "agitated."[114] The Video, however, portrays a rather calm Mr. Melendez who at one point leans casually against the hood of the patrol car.[115] After watching the Video, Deputy Warren conceded that Mr. Melendez was not being volatile, hostile,

---

[107] Video at 00:01:38-00:01:42.

[108] *Id*. at 00:01:38-00:02:32; Transcript at 77:21-23.

[109] Video at 00:02:36-00:02:50

[110] *Id*. at 00:02:36-00:02:50; Transcript at 79:25-80:4.

[111] Video at 00:02:36-00:02:50; Transcript at 80:5-7.

[112] Video at 00:02:36-00:02:50.

[113] *Id*. at 00:02:58-00:03:04.

[114] Police Report at 3 (angry); Transcript at 69:20-24 (angry), 86:11-12 (argumentative), 86:23-24 (worked up and agitated); Video at 00:05:00-5:03 (arguing).

[115] Video at 00:02:58-00:4:35.

or verbally aggressive.[116] Mr. Melendez even attempted to explain that he was simply trying to understand what was going on and the reasons for his detention.[117]

In response to Mr. Melendez's questions, Deputy Warren told Mr. Melendez that he can legally run a K-9 around any vehicle.[118] Deputy Warren testified that he ran the K-9 prior to receiving Mr. Melendez's driver's license information back from dispatch.[119] There was no testimony indicating when Deputy Warren became aware of the dispatch report that Mr. Melendez had no warrants. However, the radio log (provided by Millard County Sheriff's Office) reveals that a "NO NCIC WANT" (no warrant) on Mr. Melendez was reported back to Deputy Warren approximately five seconds before he radioed notice of the K-9's deployment.[120]

Deputy Warren testified that as he began to deploy the K-9, the dog attempted to jump into the open driver's side door of the vehicle.[121] However, the Video shows that the door was closed when Mr. Melendez and Deputy Warren walked away from the vehicle, and was still closed when Deputy Warren deployed the K-9.[122] And prior to the K-9 sniff, the vehicle had become locked.[123]

Deputy Warren explained to Mr. Melendez that the K-9 alerted and indicated to the odor of narcotics.[124] Deputy Warren told Mr. Melendez that the car was locked, and that he needed the

---

[116] Transcript at 86:13-87:3.

[117] Video at 00:04:05-00:4:15.

[118] Transcript at 84:9-13.

[119] *Id*. at 28:2-7, 34:25-35:2.

[120] Suppression Hearing Exhibit J ("Radio Log") ("NO NCIC WANT NAM/MELENDEZ, ROBERT" timestamped at 23:00:08; "K9 DEPLOYMENT" timestamped at 23:00:13).

[121] Transcript at 35:10-12.

[122] Video at 00:16-00:22; 7:47.

[123] *Id*. at 00:08:50-00:09:30; Transcript at 35:20-36:5, 88:15-16.

[124] Transcript at 35:7-18.

keys, to which Mr. Melendez provided minimal responses.[125] Because Mr. Melendez had chosen to stop answering questions at this point, Deputy Warren placed Mr. Melendez in handcuffs.[126]

After placing Mr. Melendez in handcuffs, Deputy Warren located and retrieved the keys from Mr. Melendez.[127] Deputy Warren then called into dispatch alerting them of his intent to perform a search on the vehicle.[128] Deputy Warren, and newly arrived Officer Whitaker,[129] searched the vehicle starting with the back hatch.[130]

In the hatch, the gray tote was discovered to contain a large amount (approximately 67 pounds) of white crystal material, which later tested positive for methamphetamine.[131] After inspecting the tote, Deputy Warren walked away from the vehicle, approached Mr. Melendez, and asked him if he "kn[e]w about the narcotics inside the back."[132] Mr. Melendez chose not to reply, after which Deputy Warren read him his *Miranda* rights.[133] Mr. Melendez invoked his rights and Deputy Warren placed him in the back of Officer Whitaker's patrol car.[134] Deputy Warren's Report does not record his question about the narcotics; his reading of *Miranda* rights; and Mr. Melendez's invocation of those rights.[135] Deputy Warren conceded in his testimony that such information would have been an important thing to place in his Report.[136]

---

[125] *Id*. at 35:20-36:5; Video at 00:08:50-00:09:30.

[126] Video at 00:08:50-00:10:00.

[127] *Id*. at 00:10:00-00:10:06.

[128] *Id*. at 00:10:10-00:10:13.

[129] Police Report at 4.

[130] Video at 00:10:55-00:11:12.

[131] Transcript at 36:6-21.

[132] Video at 00:11:13-00:11:21.

[133] *Id*. at 00:11:20-00:11:40.

[134] *Id*. at 00:11:22-00:12:10.

[135] Police Report at 3.

[136] *Id*.; Transcript at 43:9-13.

Deputy Warren then returned to Mr. Melendez's vehicle to finish conducting the search.[137] He first conducted a further search of the hatch area—including a thorough search of the tote and suitcase.[138] While Deputy Warren called information into dispatch, Officer Whitaker performed a cursory inspection of the driver's side passenger area and the driver's seat area.[139] In the center console two rubber-banded bundles of cash were located, which, combined with the money from Mr. Melendez's pockets, totaled over $12,000.[140]

Before moving on to inspect the rear passenger side area of the vehicle, Deputy Warren told Officer Whitaker, "I asked the right questions, and he answered them just the way I wanted him to. Or the way I was hoping him to, hoping he would."[141] In talking with Officer Whitaker, Deputy Warren also mimicked Mr. Melendez's response to the Deputy's query regarding consent as an aggressive "Why? Why? Why? Why?".[142] Deputy Warren and Officer Whitaker continued searching the passenger side of the vehicle and then moved on to the driver's seat area and the center console.[143]

Upon concluding the vehicle's search, Deputy Warren placed all the items found in the vehicle and from Mr. Melendez's pockets on the hood of his patrol car—minus the tote and suitcase, which were left inside the vehicle.[144] A tow truck was called to transport the vehicle to the police station where further searches would be performed once a warrant was obtained.[145]

---

[137] Video at 00:13:43.

[138] Id. at 00:13:43-00:00:16:55.

[139] Id. at 00:16:55-00:17:16.

[140] Transcript at 37:1-8.

[141] Video at 00:17:35-00:17:42.

[142] Id. at 16:00.

[143] Id. at 00:17:45-00:20-20.

[144] Id. at 00:20:24-00:20:35.

[145] Police Report at 4.

While waiting for the tow truck, Deputy Warren took photos of the seized items, manipulated Mr. Melendez's cell phones, and bagged the items in anticipation of being taken to the station.[146]

Also during this time, Deputy Warren took two calls on his cell phone.[147] It is unclear who he was speaking to, but throughout the course of the conversations Deputy Warren recounted the events of the night.[148] During one of the conversations, Deputy Warren is heard discussing the charges against Mr. Melendez, mentioning "local charges for possession of meth with the intent to distribute."[149] Deputy Warren also informed the unknown person on the call that Mr. Melendez told him he had $2,500, despite Mr. Melendez telling him it was $2,000.[150] In another call almost immediately thereafter, Deputy Warren stated that Mr. Melendez had $2,000.[151]

When the tow truck driver arrived on scene and after prepping the vehicle to be towed, but before loading the vehicle onto the tow truck, Deputy Warren asked the tow truck driver, "do you want to see a large amount of methamphetamine?"[152] The driver replied, "sure" and Deputy Warren proceeded to open the hatch of the vehicle, open the tote, and show the tow truck driver the substance inside.[153] The tow truck driver then loaded the vehicle onto the tow truck and

---

[146] Video at 00:20:35 (taking photos), 00:25:36 (manipulating cell phones); 00:25:19-00:27:23 (bagging items).

[147] *Id*. at 00:32:00-00:35:43 (first phone call), 00:36:40-00:41:10 (second phone call).

[148] *Id*. at 00:32:00-00:35:43 (first phone call), 00:36:40-00:41:10 (second phone call).

[149] *Id*. at 00:40:10-00:40:16.

[150] *Id*. at 33:34.

[151] *Id*. at 37:25.

[152] *Id*. at 00:41:45-00:42:17.

[153] *Id*. at 00:41:45-00:42:17.

Deputy Warren followed as the vehicle was transported back to the station.[154] Mr. Melendez transported to the jail by Officer Whitaker.[155]

Back at the station, Deputy Warren conversed with other officers and his Sergeant about the events of the night. During one of these conversations, Deputy Warren stated that Mr. Melendez "was so wound up."[156] Later, Deputy Warren imitated Mr. Melendez indicating that he had said, "[I] don't know why you're F-ing doing this."[157] This statement is not recorded anywhere on the Video.[158] Deputy Warren is also heard mimicking Mr. Melendez saying, "Why do you need my keys" in an angry tone.[159] However, Mr. Melendez did not speak in response to Deputy Warren's request for his keys.[160]

Upon further inspection of the vehicle and the seized items at the station, it was determined that the tote contained approximately 67 pounds of methamphetamine and a total of $12,619 in U.S. currency was seized.[161] Based on the above evidence, Mr. Melendez was charged with Possession with Intent to Distribute and Possession of a Controlled Substance.[162]

The following table highlights the many differences between the evidence presented by the government:

---

[154] *Id*. at 00:45:00-53:20.

[155] Police Report at 5.

[156] Video at 00:55:25-00:55:30.

[157] *Id*. at 00:59:21-00:59:25.

[158] *Id*. at 96:12-17, 130:2-7.

[159] *Id*. at 96:20-97:5; Video at 00:59:43-00:59:50.

[160] Transcript at 35:24-36:2.

[161] *Id*. at 36:19-21 (methamphetamine), 37:6-8 (cash).

[162] Police Report at 4.

| Event | Video | Police Report | Deputy's Testimony (Transcript) | What Deputy Told Others (Video) |
|---|---|---|---|---|
| Time | -- | 23:14 hours (at 3) | Before 2300 (at 19:2-4) | -- |
| Location of Mr. Melendez's vehicle | -- | East side of the motel (at 3) | North side of the motel (at 61:5-6) | West side of the motel (at 32:28) |
| What Deputy observed upon arrival | -- | Saw Mr. Melendez urinating (at 3) | Did not see Mr. Melendez urinating, only zipping up pants (at 56:7-9) | Saw Mr. Melendez urinating (at 47:25) |
| Where conversation took place | Mr. Melendez sitting in his own vehicle (at 00:00) | Mr. Melendez standing outside vehicle (at 3) | Mr. Melendez inside own vehicle (at 64:14-19) | -- |
| Mr. Melendez getting back into his vehicle | Conversation took place outside vehicle (at 1:00) | -- | Deputy had Mr. Melendez get back into his vehicle (at 67:23-25) | -- |
| Mr. Melendez looking for place to camp | Mr. Melendez says once that he is looking for place to camp (at 1:48) | One mention of finding place to camp, not repeated (at 3) | Mr. Melendez continuously stating he just wants to find a place to camp (at 38:19-21) | -- |
| Questions about drugs | Asks about "anything illegal" (at 00:45)<br><br>When telling Mr. Melendez the basis for detention, Deputy Warren states large amounts of cash; nothing about methamphetamine response (at 03:17) | Questioned about "anything illegal," no mention of individual questions (at 3) | Asked individual questions about each drug and money; Mr. Melendez hesitated on methamphetamine and money questions (at 31:10-22) | Individual questions about each drug, Mr. Melendez hesitated on methamphetamine question only (at 33:15)<br><br>No hesitation on money question (at 33:26)<br><br>Mr. Melendez hesitated on the methamphetamine question only (at 33:15)<br><br>Mr. Melendez hesitated on the methamphetamine question and cash question (at 37:11)<br><br>Mr. Melendez hesitated on heroin and methamphetamine questions (at 46:41) |
| The cash | Mr. Melendez estimated just over $2000 (at 1:00) | "[L]arge sum of money"; no mention of amount (at 3) | "[L]arge amount of U.S." currency (at 33:19-21) | Said that Mr. Melendez indicated there was over $2500 (at 33:34) |
| Mr. Melendez's cell phones | Not shown when seized (*but see* at 20:09, 20:50) | Two were seized from Mr. Melendez's person (at 3) | One phone seized from Mr. Melendez's person and one from his vehicle (at 90:10-11) | -- |

| Event | Video | Police Report | Deputy's Testimony (Transcript) | What Deputy Told Others (Video) |
|---|---|---|---|---|
| Time of discussion about large amounts of currency | Mr. Melendez had already taken out cash prior to talking about drug dog deployment (at 00:30, 2:35) | Asked if Mr. Melendez had large amounts of money after talking about deploying drug dog (at 3) | Asked if Mr. Melendez had large amounts of money after talking about deploying drug dog (at 69:18-21, 70:10-20) | -- |
| Melendez demeanor generally | Appears generally calm, annoyed but not nervous or angry | Melendez nervous and agitated (at 3) | Nervous (at 66:1-12; 69:8-10) | Angry, "don't know why you're F-ing doing this" (at 59:23) |
| Emptying pockets in relation to time of detention | Had Mr. Melendez empty pockets before being detained, or telling him (at 00:30, 2:52) | Had Mr. Melendez empty pockets before detaining him (at 3) | Had Mr. Melendez empty pockets before being detained, or telling him (at 71:11-12, 72:9-11) | Had Melendez empty pockets *after* he told him he was detained (at 47:10-47:20) |
| Requesting consent to search vehicle | Does not give consent; says he would rather leave. Not angry or loud (at 2:45) | No mention of asking for consent (at 3) | Informed Mr. Melendez he was going to run drug dog; Mr. Melendez got agitated again (at 34:20-23) | Mr. Melendez was loud, arguing, asking "why" (at 15:50, 16:07) |
| Reason to run drug dog | Just because, "no big deal" (at 02:35) | Because of time of night and the area (at 3) | Because of time of night and the area (at 69:18-21) | -- |
| Mr. Melendez's response to being told drug dog would be deployed | Does not appear angry; tells Deputy he would rather just leave (at 2:35) | Mr. Melendez was angry and asking why (at 3) | Mr. Melendez was angry and asking why (at 69:20-24) | -- |
| Deploying drug dog | Told Mr. Melendez he was going to run the drug dog, did not ask or offer (at 02:35) | Told Mr. Melendez he was going to run the drug dog, did not ask or offer (at 3) | -- | Asked Mr. Melendez if he minds if the drug dog is deployed (at 33:00) |
| Where dog alerted | Mr. Melendez closes the vehicle door when he gets out (at 00:16-00:22)  Can see door closed as Deputy Warren's flashlight shines off window at beginning of dog search (at 07:47) | Dog alerted to front driver's side door (at 3) | K-9 went to jump in the open driver's side door (at 35:10-12) | -- |

| Event | Video | Police Report | Deputy's Testimony (Transcript) | What Deputy Told Others (Video) |
|---|---|---|---|---|
| Mr. Melendez response when told dog indicated and Deputy Warren needed keys | No intelligible response from Mr. Melendez; he does not appear angry or upset (at 09:25) | Mr. Melendez was no longer speaking (at 3) | Mr. Melendez would not answer (at 36:24-37:2)<br><br>Mr. Melendez was not aggressive in any way (at 88:17-19) | Mr. Melendez argued and was belligerent about dog indicating (at 34:25)<br><br>Mr. Melendez was arguing about "why do you need my keys?" (at 59:50) |
| Conversation about being detained | Mr. Melendez appeared annoyed, but not angry (at 2:54) | -- | -- | Mr. Melendez argued with Deputy Warren (at 33:00, 47:15) |

## CONCLUSIONS OF LAW

### The Initial Investigative Detention was Lawful

The Fourth Amendment protects individuals from "unreasonable searches and seizures."[163] An officer may constitutionally "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."[164] An investigative detention is based on reasonable suspicion if the detaining officer has "a particularized and objective basis for suspecting the person stopped of criminal activity."[165] "The detaining officer needs only to articulate 'some minimal level of objective justification' for the detention."[166]

Deputy Warren was initially justified in approaching and detaining Mr. Melendez. When he first observed Mr. Melendez's vehicle, it was in the parking lot of a motel which was closed for renovations.[167] It was late at night, dark, there were no other vehicles in the area, and the

---

[163] U.S. Const., Amend. IV.

[164] *United States v. Neff,* 681 F.3d 1134, 1137-1138 (10th Cir. 2012) (quoting *United States v. Sokolow,* 490 U.S. 1, 7 (1989)).

[165] *Ornelas v. United States,* 517 U.S. 690, 696 (1996) (internal quotations omitted).

[166] *United States v. Briggs,* 720 F.3d 1281, 1284-1285 (10th Cir. 2013) (quoting *Sokolow,* 490 U.S. at 7).

[167] Transcript at 29:7-14.

hotel had recently experienced graffiti and other vandalism.[168] Mr. Melendez's vehicle was parked away from the lighted truck stop, and was in the darkened area near the motel.[169] And as Deputy Warren approached the vehicle, he observed Mr. Melendez by the side of the motel zipping up his pants.[170]

Based on Mr. Melendez's presence at the closed business late at night, and the recent vandalism to the motel, Officer Warren had a reasonable, articulable suspicion of criminal activity to briefly detain Mr. Melendez to question him about why he was parked at the motel and to investigate potential offenses of trespassing, vandalism, criminal mischief, and public urination.

### The Stop Was Extended Beyond Its Initial Scope

An investigative detention must be temporary, "last[ing] no longer than is necessary to effectuate th[e] purpose" of the stop.[171] As part of a routine traffic stop,[172] an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation."[173] An officer may also generally inquire about the driver's travel plans,[174] and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop.[175] But "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and

---

[168] *Id*. at 20:12-24, 47:13-48:2, 48:24-49:5, 54:12-24; Police Report at 3.

[169] Transcript at 20:12-24, 47:13-48:2, 48:24-49:5, 54:12-24; Police Report at 3.

[170] Transcript at 22:8-15, 56:7-9; Police Report at 3.

[171] *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal quotations omitted).

[172] Deputy Warren did not stop Mr. Melendez's vehicle as it traveled on the road. Rather, he approached Mr. Melendez while he stood next to his parked vehicle. This does not affect the analysis. *United States v. Burleson*, 657 F.3d 1040, 1047 (10th Cir. 2011).

[173] *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001); *see also Rodriguez,* 575 U.S. at 355.

[174] *United States v. Williams,* 271 F.3d 1262, 1267 (10th Cir. 2001).

[175] *United States v. Simpson,* 609 F.3d 1140, 1146 n. 1 (10th Cir. 2010).

questioning must cease; at that point, the driver must be free to leave."[176] "Authority for the seizure ends when tasks tied to the [stop's initiation] are—or reasonably should have been—completed."[177] The officer is not permitted to launch a separate investigation that extends the stop without an articulable suspicion of criminal activity.

An officer runs afoul of the Fourth Amendment when the officer extends an investigatory detention beyond "the time needed to handle the matter for which the stop was made."[178] The deployment of a K-9 is "not fairly characterized as part of [an] officer's traffic mission" because "[a] dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing."[179] As such, police may not extend an otherwise completed stop to conduct a dog sniff absent independent reasonable, articulable suspicion of criminal activity.[180]

Even before he spoke with Mr. Melendez, Deputy Warren observed that Mr. Melendez—an older gentleman in a newer, high-end vehicle—was not among the kids with skateboards or young adults in a minivan who had vandalized the motel earlier in the month.[181] Deputy Warren testified that Mr. Melendez was not engaged in any vandalism or criminal mischief regarding the motel or otherwise.[182] Deputy Warren also concluded that Mr. Melendez was not trespassing.[183] Nor did Deputy Warren pursue a citation on these grounds.[184]

---

[176] *United States v. Villa,* 589 F.3d 1334, 1339 (10th Cir. 2009).

[177] *Rodriguez,* 575 U.S. at 354.

[178] *Id.* at 350.

[179] *Id.* at 355-356 (internal quotations and punctuation omitted).

[180] *Id.* at 353, 357.

[181] Transcript at 47:13-49:11; Police Report at 3.

[182] Transcript at 80:15-81:1.

[183] *Id.* at 84:20-23.

[184] *Id.* at 57:11-23, 85:9-23.

Deputy Warren also confirmed that the investigation regarding public urination was complete by the time Mr. Melendez got back into his vehicle.[185] Deputy Warren had not actually seen Mr. Melendez urinating, and conceded that because of the remote location, late hour, darkness, and Mr. Melendez's position in relation to his vehicle and the surrounding landscape, there was no one around who could have seen Mr. Melendez urinating or to whom he possibly could have caused alarm.[186] Deputy Warren lacked a reasonable justification to believe that Mr. Melendez's conduct would meet the necessary statutory element of affront or alarm required in the Utah's Public Urination statute.[187] Deputy Warren testified that by the time Mr. Melendez got back into the black Infiniti the purpose of and justification for his initial detention had been fully satisfied.[188] The basis for the initial detention was completely dispelled.[189]

However, Deputy Warren had received from Mr. Melendez his identification and had requested dispatch run warrants check on Mr. Melendez. He was still awaiting the return of information from dispatch while he engaged in conversation with Mr. Melendez and performed a *Terry* frisk. This was permissible and reasonable under the circumstances.[190] Therefore, the stop remained lawful while Deputy Warren waited for dispatch's response.

But the return of that information came quickly from dispatch, with negative results.[191] At this point, absent probable cause or reasonable articulable suspicion of criminal activity,

---

[185] *Id*. at 85:9-23.

[186] *Id*. at 56:7-20.

[187] Utah Code Ann.§ 76-9-702.3.

[188] Police Report at 3; Transcript at 20:17-23, 63:2-10, 84:20-25, 85:5-23.

[189] *Id*. at 85:9-23.

[190] *Rodriguez,* 575 U.S. at 355; *Caro,* 248 F.3d at 1244; *United States v. Rodriguez*, 739 F.3d 481, 485 (10th Cir. 2013).

[191] Radio Log.

Deputy Warren was legally required to release Mr. Melendez and send him on his way.[192]

Instead of concluding the stop, Deputy Warren extended the stop and deployed the K-9 around

the vehicle. In doing so, Deputy Warren extended the stop beyond its initial scope.

The Radio Log indicates that approximately five seconds elapsed between when the

NCIC check returned and when Officer Warren deployed the K-9 unit.[193] But "[t]he Supreme

Court has . . . made clear . . . that an individual 'may not be detained even momentarily without

reasonable, objective grounds for doing so.'"[194] The length of the continued detention is

immaterial, that there was a continued detention is what matters.

Because Deputy Warren extended the stop to deploy the K-9 unit, he was required to

obtain consent to do so, or to have a reasonable articulable suspicion of criminal activity. And in

the absence of such consent or suspicion, the stop became unlawful.

### The Extension of the Stop Was Unlawful

An officer may extend a stop beyond its initial scope if the suspect consents to further

questioning or if the detaining officer has a particularized and objective basis for suspecting the

person stopped of criminal activity.[195] There was clearly no consent in this case,[196] so the only

basis upon which the stop could lawfully continue is if Deputy Warren had a particularized and

objective basis for suspecting that Mr. Melendez was engaged in other criminal activity.

While reasonable suspicion is a lesser standard than probable cause, the Fourth

Amendment demands that an officer must demonstrate a certain level of objective justification

---

[192] *Rodriguez,* 575 U.S. at 354; *Villa,* 589 F.3d at 1339.

[193] Radio Log.

[194] *United States v. Lopez,* 443 F.3d 1280, 1285 (10th Cir. 2006) (quoting *Florida v. Royer,* 460 U.S. 491, 498 (1983)); *see also Burleson,* 657 F.3d at 1045.

[195] *United States v. Patten,* 183 F.3d 1190, 1193 (10th Cir. 1999); *United States v. West,* 219 F.3d 1171, 1176 (10th Cir. 2000).

[196] Transcript 80:1-7.

for making a stop.[197] An officer must be able to "articulate more than an inchoate and unparticularized suspicion or a hunch of criminal activity."[198] The presence or absence of reasonable suspicion is not determined by one single factor, but rather is evaluated under the totality of the circumstances.[199] However, a sufficient reasonable articulable suspicion is "dependent upon both the content of information possessed by police and its degree of reliability"—"quantity and quality" matter in considering the totality of circumstances.[200]

Deputy Warren points to four circumstances as the basis for an independent reasonable, articulable suspicion to extend the stop for the K-9 deployment: (1) the time of night and location of Mr. Melendez's vehicle; (2) Mr. Melendez's nervousness; (3) Mr. Melendez's travel plans, and (4) the cash found on Mr. Melendez's person. These circumstances, considered in the totality of the circumstances of the stop, are not sufficient.

**The time of night and location of Mr. Melendez's vehicle**

The time of night and location of Mr. Melendez's vehicle were certainly suspicious. These circumstances were sufficient to render the stop's initiation lawful.[201] However, Deputy Warren investigated these circumstances and found that his purpose of and justification for initiating the stop had been fully satisfied.[202] Mr. Melendez explained, and Deputy Warren observed, that he had parked by the motel to urinate where no one would see him. Mr. Melendez also explained that he was looking for somewhere to camp, and that in his experience, he would be allowed to stay in the trucker areas. Under the totality of circumstances, the time of night and

---

[197] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

[198] *Id*. at 123-24 (internal quotations omitted).

[199] *Alabama v. White*, 496 U.S. 325, 330 (1990).

[200] *Id*.

[201] *Supra*, Conclusions of Law at 21-22.

[202] *Id*. at 22-25.

location of Mr. Melendez's vehicle provide little to no support for Deputy Warren having a reasonable, articulable suspicion of criminal activity to extend the stop for the K-9 deployment.

**Deputy Warren's perception of Mr. Melendez being nervous**

The Tenth Circuit Court of Appeals "ha[s] held consistently that nervousness is of limited significance in determining whether reasonable suspicion exists."[203] This acknowledges that "it is common for most citizens, whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer."[204] Additionally, "unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously."[205] Therefore, there is reluctance to afford nervousness significant weight as a factor contributing to reasonable suspicion.[206] "[R]eliance on . . . nervousness . . . must be treated with caution."[207] There must be "signs of nervousness beyond those normally anticipated during a citizen-police encounter."[208] "Extreme and persistent nervousness, however, is entitled to somewhat more weight."[209]

The Tenth Circuit also "require[s] specific indicia that the defendant's nervousness was extreme and will not give credit to an officer's naked assertion" to that effect.[210] The more

---

[203] *Simpson*, 609 F.3d at 1147 (internal quotations omitted).

[204] *Id.* (internal quotation marks omitted).

[205] *Id*. at 1147-1148.

[206] *Id*.

[207] *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998) (alterations in original).

[208] *United States v. Pettit*, 785 F.3d 1374, 1380 (10th Cir. 2015).

[209] *Simpson*, 609 F.3d at 1148.

[210] *Pettit*, 785 F.3d at 1380.

"nervous" behaviors an officer can point to, the better, and the more observable or visceral the reaction, the more likely the nervousness is deemed extreme.[211]

Deputy Warren points to three behaviors to establish Mr. Melendez's level of nervousness: (1) perceived hesitation from Mr. Melendez in response to questions about his travel, methamphetamine, and large amounts of cash when compared to other questions; (2) perceived glancing away when answering questions regarding his travel, methamphetamine, and large amounts of cash; and (3) perceived shaky hands.[212] These behaviors do not rise to the level of extreme nervousness and are not entitled to any weight in the reasonable suspicion analysis. These behaviors are not visceral, they were not persistent, and while Deputy Warren may have observed them, they were not observable in the Video of the encounter. To the contrary, the Video demonstrated that prior to the K-9's deployment, Mr. Melendez was calm and consistently responsive to Deputy Warren's questioning.

It is significant that the entire line of questioning, which is integral to forming the basis of Deputy Warren's reasonable suspicion, is not captured on the Video.[213] Any observation of Mr. Melendez glancing away, hesitating, shaking, or general nervousness cannot be corroborated. And Deputy Warren has demonstrated credibility issues in his varying descriptions of the events in his Police Report, his testimony, and his later discussions with others recorded in the Video. Deputy Warren has shown a tendency to mischaracterize or exaggerate the demeanor of Mr. Melendez throughout the encounter. Therefore, considerable weight is given to the Video as the most reliable source in determining the demeanor of Mr. Melendez.

---

[211] *Simpson*, 609 F.3d at 1148 (uncontrollable shaking described as full body tremors); *Courtney v. Oklahoma ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1221 (10th Cir. 2013) (heart beating visibly through shirt, carotid artery visibly pulsing, heavy breathing, nervous laughter, amongst others).

[212] Transcript at 32:1-4, 38:16-18, 76:13-22.

[213] *Id*. at 130:12-13.

The Video depicts a calm and responsive Mr. Melendez.[214] This is persuasive and indicative of his earlier demeanor not captured on the Video. Indeed, Deputy Warren testified that Mr. Melendez's level of nervousness remained the same throughout the encounter, neither increasing nor decreasing.[215] Mr. Melendez's behavior depicted in the Video is not indicative of extreme or persistent nervousness but of contrary calm demeanor.

Deputy Warren also testified that Mr. Melendez took 10-30 seconds to answer his questions about methamphetamine and large amounts of cash, which he considered as nervousness and evasive.[216] A 10-30 second pause before answering a question could be significant to a reasonable suspicion analysis. However, once again, the only instances that Deputy Warren points to as illustrative of such hesitation are not captured on the Video. Therefore, his assertion regarding Mr. Melendez's hesitation is afforded significantly less consideration than it would have otherwise received.

Additionally, there is considerable concern regarding whether a specific questions about methamphetamine and large amounts of cash were even asked. Deputy Warren's testimony and Report do not coincide. There are several instances where Deputy Warren has spoken about the "drug questions," including his testimony in court, in his Report, and in conversations with other officers the night of the stop. Deputy Warren's description of his questions in these instances varies.

Deputy Warren testified he asked individual questions about each specific drug and large amounts of cash, and that Mr. Melendez hesitated on the questions about methamphetamine and

---

[214] Video at 00:04:13-00:04:28; Transcript at 86:9-87.

[215] Transcript at 111:14-20.

[216] *Id*. at 102:1-12.

large amounts of case.[217] In his Report, which Deputy Warren testified would be the most accurate retelling of the events,[218] he reported that he questioned Mr. Melendez about "anything illegal."[219] The Report does not mention asking questions about individual drugs or Mr. Melendez hesitating on regarding specific individual questions. And in his recorded conversations with other officers, Deputy Warren alternately said that while questioning Mr. Melendez about each individual drug and the money, Mr. Melendez: (1) hesitated on only the methamphetamine question;[220] (2) hesitated on the methamphetamine and money questions;[221] and (3) hesitated on the methamphetamine and heroin questions.[222]

The government bears the burden of presenting sufficient reliable evidence on which findings of facts and legal conclusions may be rendered.[223] On this record, the government has not met its burden. There are multiple versions of an isolated subset of facts from a single witness, and there is no recorded version of those facts. Based on Deputy Warren's differing versions of these facts and his credibility issues, credence cannot be given to Deputy Warren's assertions that Mr. Melendez's hesitation when responding to questions contributed to a reasonable, articulable suspicion of criminal activity.

Therefore, Mr. Melendez's nervousness and hesitation, if any at all, are not, under the totality of circumstances, supportive of a reasonable, articulable suspicion of criminal activity for extending the stop for the K-9 deployment.

---

[217] *Id*. at 31:10-22.

[218] *Id*. at 43:20-24.

[219] Police Report at 3.

[220] Video at 33:15; 33:26.

[221] *Id*. at 37:11.

[222] *Id*. at 46:41.

[223] *Pettit*, 785 F.3d at 1379.

**Mr. Melendez's Travel Plans**

Inconsistent or "[i]mplausible travel plans can contribute to reasonable suspicion."[224]
However, "travel plans [are not deemed] implausible—and hence a factor supporting reasonable
suspicion—where the plan is simply unusual or strange because it indicates a choice that the
typical person, or the officer, would not make."[225] Travel plans need be "sufficiently bizarre,
inconsistent, and evasive to constitute a factor contributing to reasonable suspicion."[226] And
determining whether a defendant's travel plans rise to this level requires a highly factual
analysis—one that turns on the context and specific details provided.[227]

Deputy Warren did not obtain enough information regarding Mr. Melendez's travel plans
to support a reasonable, articulable suspicion based on this factor. Deputy Warren asked where
Mr. Melendez was coming from, to which Mr. Melendez answered that he had been traveling
15 ½ hours,[228] which included at least one stop for gas.[229] Deputy Warren repeated his question
and Mr. Melendez answered, "Merced, California."[230] And Deputy Warren asked where Mr.
Melendez was traveling, to which Mr. Melendez stated "Minnesota."[231]

This is the full extent of information gathered by Deputy Warren regarding Mr.
Melendez's travel. Although Deputy Warren's testimony indicates that he perceived Mr.
Melendez's answers to be evasive and not entirely true,[232] he did not engage in further

---

[224] *Simpson*, 609 F.3d at 1148.

[225] *Id.* at 1149.

[226] *Id.* at 1151.

[227] *Id.* at 1149-51.

[228] Transcript at 24:5-9, 65:11-18, 66:2-5; Police Report at 3.

[229] Transcript at 25:19-22.

[230] *Id*. at 24:5-9, 65:11-18, 66:2-5; Police Report at 3.

[231] Transcript at 24:9-13.

[232] *Id*. at 25:7-25.

investigation to suggest or establish that the travel plans were inconsistent or implausible. He did not gather specifics; he did not gather details; and he did not note any contradictions or inconsistencies.

At most, Deputy Warren points to his belief that, based on trips to California he had made in the past, travel from California should have taken around 10 to 11 hours.[233] But Deputy Warren did not identify where in California he had travelled, or whether he knew where Merced was located in relation to those destinations. Because Deputy Warren did not ask any follow up questions, and Deputy Warren did not evidence knowledge of Merced's location, any perceived inconsistency or implausibility in Mr. Melendez's travel plans does not support a reasonable, articulable suspicion of criminal activity to extend the duration of the stop. Indeed, Deputy Warren acknowledged that a person driving from California to Minnesota might stop for gas or to sleep,[234] but he did not account for such stops in the travel time he internally calculated. There is also no evidence that Deputy Warren even knew how long Mr. Melendez had been parked at the motel.

Deputy Warren's bald belief that Mr. Melendez's 15 ½ hour travel time was evasive or untrue is not sufficient to support a reasonable, articulable suspicion of criminal activity to extend the stop. Therefore, this factor does not contribute to a reasonable, articulable suspicion under the totality of circumstances.

---

[233] *Id*. at 25:10-12.

[234] *Id*. at 83:21-84:1.

**The amount of cash Mr. Melendez was traveling with**

Deputy Warren performed a search of Mr. Melendez's person and discovered what Mr. Melendez informed him was "a little over $2,000" in cash.[235] Deputy Warren testified that this triggered his suspicion of criminal activity because Mr. Melendez previously indicated that he was not traveling with large quantities of cash.[236] Deputy Warren also found unusual the denominations of the cash, and that it was rubber-banded.[237] Deputy Warren's characterization of the money, its appearance, and Mr. Melendez's statements about it are not sufficient to support a reasonable, articulable suspicion of criminal activity under the totality of circumstances.

Mr. Melendez explained that the cash was his traveling cash for the trip from California to Minnesota.[238] And when testifying, Deputy Warren conceded that the term "large amounts of cash" may vary significantly from person to person and activity to activity, particularly given a cross-country trip.[239] This assessment is accurate. Without context, $2,000 in cash can be considered a large sum. But in the context of an individual traveling by car across the county, that amount of money is not necessarily a large sum or at all unusual for someone to innocently carry. Therefore, while the amount of cash Mr. Melendez was carrying is capable of supporting a reasonable, articulable suspicion of criminal activity, it does not weigh heavily in the totality of circumstances.

---

[235] *Id*. at 75:21-76:5; Video at 00:00:45-00:01:02.

[236] Transcript at 34:6-14.

[237] *Id*. at 33:25-34:14.

[238] *Id*. at 33:19-24, 75:21-76:5; Video at 00:00:45-00:01:02; Police Report at 3.

[239] Transcript at 82:23-84:7; Video at 00:03:17-00:03:24.

Deputy Warren emphasized in his testimony that "[w]ith that small of denominations and that large amount of cash, in my training and experience, it goes along with the distribution and sales of narcotics. The rubber banding, most people don't travel with rubber bands around their money. It's usually in a wallet."[240] But at the time Mr. Melendez produced the cash, Deputy Warren could not decern the different denominations of the money. When Mr. Melendez placed the money on the hood of the patrol car, the rubber band around the money was visible, but the different denominations were not.[241] Deputy Warren's knowledge of the denominations is information that he obtained after-the-fact and cannot be used to support a reasonably, articulable suspicion of criminal activity to extend the stop for the K-9 deployment.

Based on Deputy Warren's testimony regarding his training and experience, the rubber-banding of the cash can be supportive of a reasonable, articulable suspicion of criminal activity. But like the amount of cash, its rubber-banding does not weigh heavily in the totality of circumstances. There are countless modes of carrying cash: wallets; purses; envelopes; rubber-banded; loose; etc. That Mr. Melendez was using rubber bands may be unusual and may create some suspicion, but without more, Detective Warren is left with only a hunch that this meant Mr. Melendez was involved in criminal activity. Neither the existence of the cash, its amount, or the manner in which it was possessed is sufficiently suspicious to support extending the stop for a K-9 deployment under the totality of circumstances.

**The totality of circumstances**

In considering the totality of the circumstances, Deputy Warren did not have a sufficient reasonable, articulable suspicion of criminal activity to extend the stop for the K-9 deployment.

---

[240] Transcript at 34:10-15.

[241] Video at 00:00:29-00:01:05.

The evidence does not support a conclusion that the time of night and location of Mr. Melendez's vehicle greatly contributed to a reasonable articulable suspicion for extending the stop. The evidence does not support a conclusion that Mr. Melendez displayed nervousness or evasiveness to support a reasonable articulable suspicion for extending the stop. The evidence does not support a conclusion that Mr. Melendez's travel plans contributed to a reasonable articulable suspicion for extending the stop. And the cash taken from Mr. Melendez's person, while capable of creating some suspicion, was not sufficiently suspicious to support a reasonable articulable suspicion for extending the stop under the totality of circumstances.

Because the government failed to present sufficient evidence of an independent reasonable articulable suspicion justifying the K-9 deployment that extended the stop, all subsequent actions by Deputy Warren—the dog sniff, the K-9 alert, and car search—were unlawful under the Fourth Amendment.

## Conclusion

While Deputy Warren's initial investigative stop of Mr. Melendez was lawful, the purpose of that stop was complete when the NCIC report came back from dispatch. Because the NCIC report came back from dispatch before the K-9 was deployed, Deputy Warren's decision deploy the K-9 extended the investigatory stop beyond its initial basis. Deputy Warren was required to have an independent reasonable, articulable suspicion of criminal activity to extend the stop for the K-9 deployment. And Deputy Warren did not have a sufficiently reasonable articulable suspicion. Therefore, the extension of the stop by the K-9 deployment was unlawful under the Fourth Amendment, and all evidence obtained after the NCIC report came back from dispatch must be suppressed.

## ORDER

IT IS HEREBY ORDERED that Mr. Melendez's Motion to Suppress[242] is GRANTED.

All evidence obtained after the NCIC report came back from dispatch is suppressed.

Signed this 16th day of March, 2022.

BY THE COURT:

David Nuffer
United States District Judge

---

[242] Docket no. 22, filed Sept. 16, 2021.